[No. 5630.]

The Big Five Tunnel, Ore-Reduction and Transportation Company v. Johnson.

1. **Master and Servant — Vice-Principal — Knowledge** of the foreman of a mine, as to the usage and practice of those working under him, is the knowledge of the mine owner.—P. 242.

2. **Custom — Enlarging Servant's Scope of Employment —** The servant's scope of employment may be enlarged by a practice sufficiently uniform, open, and long-established, to prove a custom, and knowledge of which is brought home to the master. Knowledge of the mine foreman is the knowledge of the master.—P. 242.

3. **Evidence — Burden of Proof**—Action against the master for the death of a servant attributed to negligence of a fellow-servant; plea that the offending servant was acting without the scope of employment; the master has the burden of proof; and

if the negligence of two working together occasioned the accident, and one of them was acting outside his employment, the defendant must go further and prove that the other did not materially participate in the negligent act.—P. 244.

4. **Contributory Negligence — Matter of Defense** — The defendant alleging the contributory negligence, has the burden of proof.—P. 247.

A custom or usage will more readily be implied in favor of an employee than in favor of a volunteer.—P. 243.

The practice of presenting new questions upon rehearing discouraged.—P. 252.

*Appeal from Boulder District Court.*

*Hon. Christian A. Bennett, Judge.*

Mr. GEO. STIDGER and Mr. GEO. S. REDD, for appellants.

Messrs. ROGERS, CUTHBERT & ELLIS, and Mr. JOHN W. HELBIG, for appellees.

Defendants were engaged in operating the Adit Tunnel System in Ward mining district, Boulder county; they were driving what was called the East Columbia drift and also what was known as the East Columbia crosscut to the north therefrom; the East Columbia drift connected with the Niwot crosscut, which in turn led to other parts of the system.

At the time of the accident, Johnson, the deceased, and another employee by the name of Ballou were at work as muckers in the East Columbia drift and Columbia crosscut. Two other men, viz.: Evans and Hoover, were also employed as drill men. Evans and Hoover would drill holes and put in shots at the breast of the drift, and then, while Johnson and Ballou were mucking the waste at that point, they would proceed to drill and shoot at the breast of the crosscut; the muckers following and removing the material shot down. The loaded cars were run down to the Niwot tunnel or crosscut, thence they were

hauled out by horses; the muckers returning with empty cars standing on a nearby switch in the Niwot crosscut. Thus these two sets of employees, for convenience and economy, alternated; while the two drill men were at work at one place, the two muckers were at work at the other place. But it sometimes happened that the drill men would complete their round of holes and shots at one point before the muckers had removed all of the waste at the other point.

Such was the situation at the time of the accident; Evans and Hoover, the former being the drill man, the latter his assistant, completed their work at the breast of the drift, and, passing to the crosscut, found Johnson and Ballou still engaged in mucking waste. It was impossible to set up the drill preparatory to drilling until the waste near the breast of the crosscut was removed; and Evans and Hoover joined Johnson and Ballou in mucking out such waste. A car being filled, Johnson and Hoover started out with it, leaving Evans and Ballou to load another car; Johnson and Hoover trammed the car to the switch in the Niwot crosscut, holding the loaded cars, and then started back with an empty car; but before doing so they went to a sanitary box about 200 to 300 feet distant and were absent five or ten minutes; in the meantime Evans and Ballou had filled their car and started out, riding upon the car in order to control the brakes, as was the custom. There was a slight grade and the loaded car reached quite a degree of speed before it collided with the empty car being brought in by Johnson and Hoover. The light on the incoming car was seen by Evans fifteen to twenty feet distant, but, though he applied the brake, the speed was such that the outgoing car could not be stopped before the collision; the empty car was thrown from the track, striking Johnson with such violence that death shortly ensued.

The Niwot crosscut was double tracked, but the East Columbia drift was not, and the accident happened on the single track above the junction of the latter drift with the former crosscut. An iron air pipe extended from the breast of the Columbia drift and crosscut to and beyond the sanitary box in the Niwot crosscut. Hoover testified that before starting back with the empty car he signaled by striking upon this pipe; Evans and Ballou testified that before they started out with the loaded car they gave two similar signals, waiting several minutes between the two; but, according to the testimony, neither of these signals was heard by the other party. By arrangement among the miners the party first signaling in such case were to have the right of way; but if the parties signaling promptly received an answering signal, they did not move; as that meant that the other party wanted the right of way.

It appears that Johnson and Hoover, after waiting long enough for a response to their signal and receiving none, assumed that the way was clear and started in; meantime Evans and Ballou, receiving no reply to their signals, started out. The evidence showed that loaded cars moved out much more rapidly than the empty cars were pushed in; one witness said five times as fast; and the speed of the outgoing cars, when not controlled by the brakes, is estimated by witnesses, the lowest at six and the highest at fifteen miles an hour. The accident occurred 156 feet above the junction of the Columbia drift with the Niwot crosscut, and at least 256 feet from the point where Johnson and Hoover started on their return trip.

The complaint originally contained four counts; but during the trial plaintiff, on motion, elected to submit the case on the first and second counts, thus eliminating the third and fourth. The first of these

counts, after alleging, among other things, that John-son and Hoover were engaged in making a round trip, charged Ballou and Evans with carelessly and negligently bringing about the collision; and that such negligence and carelessness "consisted in wrongfully setting in motion and moving the afore-said loaded mine car and making use of the afore-said ways and workings and the track therein laid while the said William Johnson was making the round trip as hereinbefore set forth."

The second count or cause of action also charges Ballou and Evans with carelessness and negligence; such carelessness and negligence being based upon the rate of speed attained by the loaded car, and that Ballou and Evans negligently failed to control such speed by the proper use of brakes and appli-ances furnished on the car for that purpose.

Defendants answer denying the negligence of Ballou and Evans; denying responsibility therefor, if such negligence occurred; and alleging contribu-tory negligence on the part of Johnson, the deceased.

Mr. JUSTICE HELM delivered the opinion of the court:

This action was brought under the employer's liability act of 1901. Plaintiff recovered $3,500.00 for the death of her husband, claimed to have been caused by the negligence of his co-employees. Our work is considerably simplified by the circumstance that negligence and contributory negligence, which subjects constitute the essence of this controversy, are in this, as in all similar cases, matters peculiarly within the province of the jury.

The complaint is not above criticism; but it was not challenged by demurrer, and plaintiff's case, as stated therein, rests upon the contention that Evans and Ballou negligently conducted the work of tram-

ming waste in which they were engaged; and that by reason of such negligence, the accident resulting in the death of Johnson occurred.

A good deal of evidence was received upon this issue of negligence, and in some respects it was quite conflicting. The conditions were such, however, as to require the submission of the question to the jury. The court, by proper instructions drawn and presented in part by defendants, carefully charged the jury to weigh the evidence and determine the issue. And while plaintiff's proofs are not so full or satisfactory as they might be, yet under the well-known rule applied in courts of review, we must accept the decision of that body in the premises; the record does not present such a condition as would justify us in setting aside the verdict on this account.

Appellants, who were defendants below, did not admit that Evans and Ballou were negligent or that any negligence on their part produced the accident. But they insist that if such negligence did exist, defendants were not legally responsible therefor.

The strongest assault on the judgment before us is based upon the proposition that Evans and Hoover were not acting within the scope of their employment at the time of the accident. Defendants invoke the principle that, even under statutes like ours, where an employee is injured through the negligence of his co-employee, the employer cannot be held responsible for the injury unless the negligent co-employee was at the time discharging the specific duties for which he was employed.

It is insisted that Evans, being a drill or machine man, and Hoover, being his helper, were not required to take the place of trammers or muckers; that when, on the day of the accident, they voluntarily undertook to assist Johnson and Ballou, the

regular trammers, they stepped entirely outside the scope of their employment; and that even if they were guilty of negligence and such negligence resulted in the death of Johnson, defendants cannot be held responsible therefor.

The answer to this argument is twofold: In the first place, plaintiff, to meet the issue thus raised, undertook to prove the existence of a usage or custom pursuant to which the machine men so often performed the work of tramming, that such work was brought practically within the scope of their employment, or at least defendants were estopped thereby from the assertion of this particular defense. It appeared that frequently during a period of two or three years preceding the accident, the machine men, having completed their work at one point before the trammers had removed the waste at another point where the drills were to be next used, aided in mucking; there is testimony that the foremen in charge of the work were sometimes present when this was being done; but there is nothing to show that either of defendants gave orders to this effect, or that their leading officials were aware of the practice. Of course, however, knowledge by the foreman, or other direct representative of defendants in charge on the ground, would be the knowledge of defendants themselves. And the existence of such usage and knowledge thereof by defendants were submitted under proper instructions to the jury and were determined by that body.

An affirmative finding of the jury in this regard would be supported somewhat by the following circumstance: These machine men were regular employees of defendants; their employment was closely allied in one respect to the work of tramming; it was clearly their duty to muck "back"—that is, if waste remained at the breast of the drift or crosscut when

they were ready to place the drill therein, it was their duty to move or shovel such waste back far enough to secure an open and level space for the machine. It was ordinarily not their duty, however, to muck "out"—that is, to shovel waste into the car and then perform the work of tramming the same. But by assisting the muckers in mucking out when they were behind, the machine men would sooner be able to resume their regular work, and the interest of their common employer would be promoted.

A marked difference exists in this respect between pure volunteers, i. e., volunteering strangers, and volunteering employees. A custom or usage will more readily be implied in the latter than in the former case. And under the circumstances here presented, an affirmative finding upon this proposition by the jury would not be at all unreasonable.

But there is another reply to the present argument of defendants. It will be remembered that Evans, the chief machine man, and Ballou, one of the trammers, were working together in tramming out waste at the time of the accident; while Hoover, the assistant machine man, and Johnson, the other trammer, were together in performing the same kind of work. The negligence is charged against Evans and Ballou; that is, against one of the machine men and one of the trammers. So that one of the persons charged with this negligence was unquestionably acting within the scope of his employment.

Neither the complaint nor the evidence separates Evans and Ballou as to the negligence; they are charged jointly, and the evidence deals with them jointly; no act of negligence is claimed or shown against one that is not claimed and shown against the other; the different acts constituting the alleged negligence all appear to have been jointly performed.

As already observed, the claim that the negligent employees were at the time of the accident acting outside the scope of their employment was an affirmative defense pleaded and relied on by defendants. And of course the burden devolved upon them to sustain the same. And in discharging this burden they were required to show that the employee whose negligence caused the injury was acting outside the purview of his employment.

When, therefore, plaintiff proved that Evans and Ballou were both at the time of the accident working together in the employ of defendants, and that such accident resulted through their negligence while doing the work of co-employees of Johnson, she had done sufficient in this regard. To render applicable the rule invoked by defendants, it was for them first, to demonstrate that Evans was acting outside the scope of his employment, and then to distinguish between Evans and Ballou and show that the negligence was that of Evans, and that Ballou did not materially participate therein.

In view of the foregoing considerations we must conclude that Evans and Ballou were guilty of negligence, and that such negligence produced the accident. We must further conclude that defendants failed to sustain the defense based upon a departure by the negligent employees from the scope of their employment.·

In this connection defendants' objection to certain evidence offered by plaintiff, and admitted, may properly be considered.

Hoover, Trotter and Rice testified to the fact that machine men sometimes assisted the muckers in mucking out waste. Counsel insist that this testimony should have been rejected. It was offered and received for the purpose of establishing the custom or usage already adverted to. The excuse for its

introduction was the defense just disposed of, viz.: that Evans and Hoover were, at the time of the accident, not working within the scope of their regular employment.

The latter contention might have been true, and yet plaintiff's recovery be allowed to stand, even had Evans and Hoover been then working together in handling the loaded car of waste. Although these men were employed to do the work of drilling and shooting, yet if they and their predecessors had for a considerable period pursued the practice of helping the muckers when the latter were behind, the scope of their employment might thereby be enlarged, or, as already observed, defendants might be precluded from relying upon the foregoing defense. The existence of such a practice with sufficient publicity and uniformity to establish a usage or custom, would have that effect; provided defendants knew, or under the circumstances should have known, the conduct of their employees in that regard. Defendants could not permit such a custom to prevail, accepting the benefits thereof, and yet avail themselves of this defense.

Hence it is that defendants' counsel base their challenge of this evidence mainly upon the ground that knowledge of such usage or custom, if the usage existed, was not brought home to their clients.

But defendants are corporations, and of course the knowledge of their representatives in charge is knowledge of the corporations themselves. The practice in question is shown to have existed to a greater or less extent in both the single and double tracked portions of the property for several years. The presence of foremen Harrison and Thomas, when machine men were thus helping muckers, is shown by the testimony of Evans, Ballou, Trotter and Rice, And Willis, the superintendent, testified that, when

a foreman, he saw this done in the Niwot crosscut. These foremen appear to have been in entire charge of the mining operations during a large part of the time; they directed the work and sometimes hired and discharged the men. It is incredible that this usage or practice could have been unknown to them. And, as above suggested, their information was that of defendants. The jury may have concluded that defendants possessed the requisite knowledge; or they may have determined that if defendants were not aware of the practice, knowledge by them must, under the circumstances, be presumed.

This brings us to the defense of contributory negligence. Supporting this defense, counsel for defendants first invoke the rule touching a choice of methods by employees. That is, where an employee voluntarily selects a dangerous way of performing his duty instead of choosing a safe method, both being equally open to him, he assumes all the risk arising through the method chosen.

The assumption of such risk by Johnson, the deceased, in this case arose, as counsel contend, in the following manner: Had the tramming been done by the "round trip" method, i. e., with but one car moving at a time, the accident obviously could not have happened; by accepting the assistance of the machine men, Johnson and Ballou introduced the moving of two cars at the same time—a loaded car out and an empty one in—while by rejecting the assistance of Evans and Hoover, they would have been absolutely safe. Thus they voluntarily chose a dangerous method; a method that subjected them to the risk of just such accidents as the one that happened.

This argument presupposes that the two trammers working alone would move but one car at a time. But there is no affirmative evidence to this

effect. And as contributory negligence is a defense, it devolved upon defendants to make the requisite proofs. In order to sustain this defense they ought to have shown that Johnson and Ballou, when working alone, did not start a loaded car out until the previous round trip was completed by return of an empty car. It may have been the practice for each of the two muckers to operate a separate car and to alternate precisely as was being done at the time of the accident. In so far as the proofs bear upon this subject, they tend slightly to show that, for a portion of the time at least, such a practice prevailed when there were but two trammers.

There might have been advantages in thus operating whether two or four men were engaged in mucking. And the code of signals, hereinafter more fully considered, points somewhat to such method by the two muckers alone. That code was adopted and in general use; the employees were all familiar with it; no special mention of it occurred on the day of the accident; its existence and applicability were assumed as a matter of course by all parties at the trial—witnesses, defendants and counsel. But this code was only necessary when cars were being moved in opposite directions on a single track. If the machine men only at rare intervals assisted the muckers, and if the muckers when working alone moved only one car at a time, it is strange that this code of signals was so universally known, and so instinctively acted upon.

But the trial court in four carefully worded instructions, two of which were asked by defendants, fairly submitted this subject to the jury. The printed argument in reply, briefly criticises instructions numbered four and five, prepared by plaintiffs; but taken in connection with the rest of the charge, we do not think the alleged imperfections were seri-

ous or could have tended in the least to mislead the jury.

Again, it is earnestly contended that Johnson was guilty of contributory negligence in disregarding, or partially disregarding, the code of signals above mentioned. The East Columbia drift and the north crosscut therefrom contained a single track only; while the Niwot crosscut, with which this drift connected, and other portions of the mine, were double tracked. The loaded cars were, as we have seen, trammed by the muckers to the Niwot crosscut, and at a distance of 700 or 800 feet from the starting point were placed upon a switch or side track to be taken out with horses; but the mucker or muckers in each instance always brought back from another switch nearby, an empty car.

In order to regulate this part of the work, and to avoid delays as well as accidents, a custom of signaling was adopted by the employees. As to this custom or usage, there is no dispute. When cars were being moved alternately, before starting out with the loaded car or beginning the return trip with an empty car, each party was required to strike with a stone or metallic substance upon the iron air pipe above described, and the one first signaling secured the right of way. That is to say, when the mucker or muckers at the breast of the drift or crosscut loaded a car and were ready to start out, he or they gave a signal upon the iron pipe, and the other party then remained in the Niwot crosscut until the loaded car came out. If, on the contrary, the signal was first given by the mucker or muckers ready to start in with the empty car, then the others held the loaded car until the empty had been returned. But a prompt answering signal in either case showed that the responding party wanted the right of way, and the signaling party then refrained from starting. So

that the party first signaling was entitled to the track, unless a counter-signal was given, in which event the other party had the right of way.

It appears that on the day of the accident when Johnson and Hoover completed the run and placed the loaded car upon the Niwot switch, they left that point and went some 200 or 300 feet down the latter crosscut to a sanitary box and were gone from five to ten minutes; Hoover says "about five minutes." When they returned, and before starting in with the empty car, they signaled upon the air pipe. Evans and Ballou, according to the evidence, also signaled twice upon the air pipe before starting out with the loaded car, allowing several minutes between signals; but neither party heard the other's signal; although Evans and Ballou were expecting the return of Johnson and Hoover, and hence must have been expecting their signal. It is contended that Johnson and Hoover were guilty of contributory negligence in passing down the tunnel to the sanitary box where they would be less apt to hear the signal of Evans and Ballou; and that otherwise they did not exercise sufficient caution in the giving and receiving of signals.

The evidence shows that the air pipe extended to and beyond the point where the sanitary box was constructed; that from the pipe to the box was only about ten feet; and that the signal sound was carried distinctly for more than 3,000 feet, or three times the distance back to the breast of the Columbia crosscut. So this act of Johnson and Hoover did not appreciably lessen their ability to hear the signal.

Besides, Johnson and Hoover must have begun their return with the empty car before Evans and Ballou started out with the loaded car. This fact appears from the following, viz.: The distance traveled by them with the empty car in the Columbia

drift before the accident occurred, coupled with the fact that the speed of the loaded car was ordinarily several times as great as the speed attained by the returning empty car, and with the further fact that before the collision Evans and Ballou had traveled out with the loaded car less than twice the distance covered by Johnson and Hoover returning with the empty car.

Hence for this reason, also, it cannot be said that the conduct of Johnson and Hoover in going to the sanitary box and remaining there five or ten minutes was the cause of the accident, or could have contributed thereto.

It is strange that neither party heard the other's signal. The jury may have concluded that the noise of their moving empty car prevented Johnson and Hoover from hearing the second signal of Evans and Ballou; although, according to the testimony, such noise, even though coupled with conversation, ought not to have had this effect. And it is strange that Johnson and Hoover did not hear the first signal given by the other parties.

But it is not necessary for us to speculate further upon this subject. The court carefully submitted the same to the jury. He covered every conceivable phase of the matter in instructions numbered 9, 11, 14 and 17. The latter three of these instructions were prepared and prayed by defendant's counsel, and presented the subject from their chosen standpoint.

Portions of the charge are criticised and the refusal of certain requests is assigned for error. The matters thus complained of are largely covered by the foregoing discussion. We have incidentally noticed with approval several instructions given the jury. Certain subjects might have been more clearly and satisfactorily presented to that body. But the

charge, as a whole, is fair, and we do not see how the jurors could have been misled; they were exhaustively enlightened from the standpoint of both parties in some twenty-two instructions.   Twelve of these instructions were the work of counsel for appellants, and upon careful consideration we feel that in this, as well as in other respects, appellants' interests were protected.   If they have suffered any wrong or injustice it was through imperfection of judgment on the part of the jury.   But there is nothing to show that that body was governed by malice or prejudice or by other improper motive, and no sufficient ground appears for interference by us.

The judgment of the court below must be affirmed.                              *Affirmed.*

CHIEF JUSTICE STEELE and Mr. JUSTICE MAXWELL concur.

### On Rehearing.

Messrs. E. N. CLARK, HENRY MCALLISTER, Jr., C. W. WATERMAN, FRED HERRINGTON, C. C. DORSEY, ROGERS, CUTHBERT & ELLIS, and PEIRPONT FULLER, *amici curiae.*

Opinion *per Curiam:*

This cause was originally heard and determined by three justices constituting a department of the court.   The controversy was then presented on its merits, the specific subjects urged for consideration being confined practically to negligence and contributory negligence.   Within the time allowed, a petition for rehearing was filed.   By this petition and the printed argument in support thereof, a question of statutory interpretation was, for the first time, strenuously urged.   It was therein asserted that the employers' liability acts of 1893 and 1901 must be so construed that the sixty days notice by plaintiff prescribed in the former, should also be required in

cases arising under the latter. Upon this question numerous additional counsel appeared, *amici curiae,* and filed exhaustive printed briefs and arguments.

The new matter thus presented was not considered at the former hearing or determined by the opinion. It was not mentioned in the opening brief for appellant or in defendant's answering printed argument. The only reference thereto covered but little over a page, at the conclusion of appellant's "supplemental and reply" brief, filed by leave of court a week before the final hearing and two years after original submission of the cause. But little reliance seemed to be placed thereon, even then, and only one authority was cited. Moreover, in closing this "supplemental" brief, a summary of the points relied on was separately stated and numbered; but this subject was wholly omitted from that summary. And finally, if it was mentioned at all at the oral argument, the reference was so brief and informal as not to attract the attention of the sitting justices, or to the slightest extent impress itself upon their memories.

Notwithstanding the foregoing circumstances, in view of the deep and general interest shown upon the present application, and in view of the further circumstance that the constitutionality of the later statute might, under one aspect of the case, become involved, a rehearing before the court *en banc* was allowed, and an oral argument, to be heard by all the justices, was ordered.

That hearing has now taken place. But upon mature consideration, the court is unanimously of the opinion that the new matter thus brought to its attention should not be determined in this case. It is not considered wise to encourage the practice of allowing, in general, practically new subjects to be brought forward for the first time upon rehearing.

The matter of statutory interpretation urged upon this rehearing will, therefore, be left open for adjudication at some future date and in some other controversy. And the opinion filed will, with certain verbal corrections, remain the opinion of the court.                    *Judgment affirmed.*